## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** § | |
| § | |
| **Plaintiff,** § | |
| § | |
| **v.** § | **Case No.: 4:25-cv-3122** |
| § | |
| **CYRUS P. NADERI,** § | **JURY TRIAL DEMANDED** |
| § | |
| **Defendant.** § | |
| § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against Defendant Cyrus P. Naderi ("Naderi" or "Defendant") and alleges as follows:

## SUMMARY

1.      This matter concerns a "free-riding" scheme perpetrated by Naderi, a resident of The Woodlands, that resulted in a collective net loss to multiple broker-dealers.

2.      In a "free-riding scheme," a broker-dealer's customer makes unfunded deposits into a brokerage account and creates the false impression of having sufficient funds to pay for securities trading.  Because broker-dealers usually allow immediate trading of deposited funds, even before a deposit is officially settled, a free-riding customer can exploit this "instant deposit" credit to trade immediately "on the house," that is, with no outlay of the customer's own money.  Typically, if the trading is profitable, the free-rider withdraws the profits from the account; if the trading is unprofitable, the free-rider leaves the loss for the broker-dealer to bear.

3.      Between April 1, 2021 and March 7, 2024 (the "Relevant Period"), Naderi initiated at least $565,000 of unfunded deposits into accounts he maintained and controlled at four different broker-dealers by making a series of Automated Clearing House ("ACH") transactions from bank

accounts he controlled that he knew lacked sufficient funds. Naderi used this "instant deposit" credit extended by the broker-dealers to buy and sell at least $22.4 million of securities, hoping to earn and withdraw trading profits before the broker-dealer was notified of the insufficient funds in Naderi's bank accounts.

4.    After Naderi's ACH transfers to the broker-dealers were rejected for insufficient funds, or when Naderi instituted a stop payment on the ACH transfer from his bank accounts, the broker-dealers froze, and eventually shut down, his brokerage accounts.

5.    At three of the broker-dealers, Naderi's free-riding activities resulted in a collective loss of at least $65,770 to the broker-dealers. At one of the broker-dealers, Naderi's trading generated a profit of $942, however, the broker-dealer prevented Naderi from transferring out the illicit trading profits.

6.    By engaging in the conduct alleged herein, Naderi violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7.    The Commission seeks permanent injunctive relief and civil penalties against Naderi.

## JURISDICTION AND VENUE

8.    The Commission brings this action pursuant to authority conferred upon it by Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d)-(e)] to enjoin the Defendant from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and transactions, acts, practices, and courses of business of similar purport and object, and for civil penalties.

9.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

10.     The Defendant, directly and indirectly, has made use of the mails, the means and instrumentalities of transportation and communication in interstate commerce, and/or the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

11.     Venue is proper in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], because Naderi resides within the Southern District of Texas; and certain of the transactions, acts, practices and courses of business constituting violations of the Exchange Act have occurred within the Southern District of Texas.

## THE DEFENDANT

12.     **Cyrus P. Naderi** ("Naderi"), age 51, is a resident of The Woodlands, Texas.

## FACTS

### A.     Misconduct at Broker A

13.     On April 1, 2021, Naderi applied to open a brokerage account at Broker A by submitting an online application in which he falsely stated that he personally had an annual income within the range of $100,000 - $249,000.  Further, Naderi falsely claimed that he was the owner of a medical services provider.  At the time he filled out the application, Naderi knew (a) his annual income was $0 in 2021 and (b) he was not the owner of a medical services provider.

14.     Once his account was open at Broker A, Naderi established an internet link between his brokerage account and a bank account he controlled at Bank A.  On July 13, 2021, Naderi initiated a $40,000 ACH deposit from this bank account to Broker A, which was ultimately reversed by Broker A on July 16, 2021.  However, within hours of the ACH deposit appearing in

his brokerage account at Broker A on July 13, 2021, Naderi exploited the instant deposit credit provided by Broker A by executing hundreds of trades whereby he bought and sold securities in transactions that totaled $6,790,104.

15.     Naderi knew the bank account had insufficient funds to cover the $40,000 deposit to his brokerage account at Broker A that seeded his trading activity, and in fact on July 15, 2021, the bank account had a closing balance of only $10,612.46.   At the time Broker A froze Naderi's brokerage account, Broker A had sustained a loss of $11,033.

16.     Undeterred, on July 19, 2021, Naderi proceeded to open a second account at Broker A, this time in his wife's name.  On August 18, 2021, Naderi initiated a $40,000 ACH deposit from a bank account he controlled at Bank A to the second brokerage account at Broker A, which was ultimately reversed by Broker A on August 23, 2021.  However, Naderi again exploited the instant deposit credit provided by Broker A in his wife's brokerage account by executing hundreds of trades within hours of the sham ACH deposit, buying and selling approximately $13,292,740 in securities in her account.

17.     Naderi knew the bank account had insufficient funds to cover the $40,000 deposit to the brokerage account in his wife's name, and in fact on August 18, 2021, the bank account had a closing balance of $0.   At the time Broker A froze the trading account in Naderi's wife's name, Broker A had sustained a loss of $25,674.

18.     At all times when Naderi was purporting to fund both brokerage accounts at Broker A and placing the trades in those accounts, he knew, or was severely reckless in not knowing, that he had insufficient funds in the bank accounts to cover the ACH transfers and that he lacked sufficient funds to cover the costs of the trades he placed in the brokerage accounts in his name and in his wife's name.

### B.    Misconduct at Broker B

19.    Shortly after Broker A froze Naderi's second brokerage account, Naderi applied for a brokerage account at Broker B by submitting an online application in which he falsely claimed that he was the manager of a medical services provider.  In addition, Naderi also listed his wife on the application, and falsely stated that her liquid net worth was over $500,000.  At the time he filled out the application, Naderi knew (a) he was not the manager of a medical services provider and (b) his wife did not have a liquid net worth exceeding $500,000.

20.    Once his account was open at Broker B, Naderi established an internet link between his brokerage account and a bank account he controlled at Bank A.  Between September 1, 2021 and September 2, 2021, Naderi initiated 10 ACH deposits, totaling $385,000, from his account at Bank A to Broker B.  Naderi immediately exploited the instant deposit credit provided by Broker B by executing dozens of trades whereby he bought and sold approximately $447,363 in securities. In a letter dated September 3, 2021, Broker B informed Naderi that his account was subject to being restricted unless he could deposit $150,045 to cover his trading activities.

21.    At all relevant times, Naderi knew, or was severely reckless in not knowing, that the bank account had insufficient funds to cover (a) the 10 ACH deposits to his brokerage account and (b) the $150,045 requested on September 3, 2021.  When Broker B froze Naderi's brokerage account, Broker B had sustained a loss of $8,167.

### C.    Misconduct at Broker C

22.    On January 29, 2023, Naderi applied for a brokerage account at Broker C by submitting an online application in which he falsely claimed that he was the manager of a medical services provider.  In addition, Naderi falsely stated that his annual income was over $150,000, his liquid net worth was over $500,000, and his net worth was over $500,000.  At the time he filled

out the brokerage-account application, Naderi knew, or was severely reckless in not knowing, (a) he was not the manager of a medical services provider, (b) he did not have annual income over $150,000, and (c) he did not have net worth, liquid or otherwise, over $500,000.

23.    Once his account was open at Broker C, Naderi established an internet link between his brokerage account and a bank account he controlled at Bank A.  On February 6, 2023, Naderi initiated a $30,000 ACH deposit from the bank account at Bank A to Broker C.  Over the next three trading days, Naderi exploited the instant deposit credit provided by Broker C by executing dozens of trades whereby he bought and sold approximately $326,539 in securities.  On February 9, 2023, Naderi initiated a stop payment in the bank account for the $30,000 ACH deposit, which reversed the deposit.

24.    When he made the ACH transfer to Broker C, Naderi knew, or was severely reckless in not knowing, that his bank account had insufficient funds to cover the $30,000 ACH deposit to his brokerage account at Broker C.  At the time Broker C froze Naderi's brokerage account, Broker C had sustained a loss of $20,896.

**D.    Misconduct at Broker D**

25.    On March 6, 2024, Naderi applied for a brokerage account at Broker D by submitting an online application in which he falsely claimed that he was employed as a medical professional.  In addition, Naderi falsely stated his annual income was $295,000, his liquid net worth was $970,000, and his net worth was $1.6 million.  At the time he filled out the application, Naderi knew, or was severely reckless in not knowing, that (a) he was not employed as a medical professional, (b) he did not have annual income of $295,000, and (c) his net worth, liquid or otherwise, was less than $970,000.

26.     Once his brokerage account was open at Broker D, Naderi established an internet link between his brokerage account and a bank account he controlled at Bank A.  On March 6, 2024, Naderi initiated a $40,000 ACH deposit from the account at Bank A to Broker D.  On March 7, 2024, Naderi exploited the instant deposit credit provided by Broker D by executing 31 trades whereby he bought and sold approximately $1,585,842 in securities.  On the day Naderi initiated his trades at Broker D, the bank account had a closing balance of approximately $410.  Also on March 7, 2024, Naderi's bank charged him a $30 stop-payment fee, providing notice that the bank account Naderi controlled did not have sufficient funds to complete the $40,000 ACH deposit to his brokerage account at Broker D.  On March 12, 2024, Naderi initiated a stop payment in the bank account on the $40,000 ACH deposit, which reversed the transaction.

27.     At the time that Naderi initiated the ACH deposit on March 6, 2024, Naderi knew, or was severely reckless in not knowing, that his bank account had insufficient funds to cover the $40,000 ACH deposit to his brokerage account at Broker D.  Ultimately, Broker D cancelled Naderi's trades, which prevented him from profiting from his free-riding activities.

## COUNT I

**Violations of the Antifraud Provisions of the Exchange Act
Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

28.     Paragraphs 1 through 27 are hereby realleged and are incorporated herein by reference.

29.     From at least April 2021 through at least March 2024, and by engaging in the acts and conduct alleged herein, Defendant Naderi, in connection with the purchase and sale of securities described herein, by the use of the means or instrumentality of interstate commerce, or of the mails, directly or indirectly:

      a.   employed a device, scheme, or artifice to defraud; and/or

b.  made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

30.  The Defendant acted with scienter and engaged in the referenced conduct knowingly or with a severe recklessness.

31.  By reason of the foregoing, Defendant Naderi has violated, and unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Commission respectfully requests that the Court enter a Final Judgment:

### **I.**

Permanently enjoining Defendant Naderi from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### **II.**

Permanently enjoining Defendant Naderi from: (i) directly or indirectly trading securities in any brokerage account that Defendant owns, controls, or has access to that does not have settled cash equal to or greater than the amount of the securities trade(s); and (ii) opening a brokerage account without first providing to the relevant broker-dealer(s) a copy of the Commission's filed Complaint in this matter and any Final Judgment that the Commission may obtain against the Defendant in this matter.

## III.

Ordering Defendant Naderi to pay a civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws as alleged herein.

## IV.

Granting such other and further relief as this Court may deem just, equitable, and appropriate.

DATED:  July 3, 2025                    Respectfully submitted,


                                        */s/ Matthew J. Gulde*
                                        Matthew J. Gulde
                                        Attorney-in-Charge
                                        Illinois Bar No. 6272325
                                        SD Texas Bar No. 1821299
                                        United States Securities and
                                        Exchange Commission
                                        Burnett Plaza, Suite 1900
                                        801 Cherry Street, Unit 18
                                        Fort Worth, TX  76102
                                        Telephone: (817) 978-3821
                                        Facsimile: (817) 978-4927
                                        guldem@sec.gov

                                        ATTORNEY FOR PLAINTIFF SECURITIES
                                        AND EXCHANGE COMMISSION